# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**Toni Gallow,**

    **Plaintiff,**　　　　　　　　　　　　　　　**Case No. 2:17-cv-1007**

    **v.**　　　　　　　　　　　　　　　　　　　**Judge Sarah D. Morrison**
　　　　　　　　　　　　　　　　　　　　　　　**Magistrate Judge Kimberly A. Jolson**

**Adam Pittis,** *et al.***,**

    **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Partial Summary Judgment. (ECF No. 33.) Plaintiff filed a Memorandum in Opposition to the Motion (ECF No. 38), and Defendants filed a Reply (ECF No. 41). The matter is now ripe for decision.

## I.　　BACKGROUND

Because this is a motion for summary judgment by the defendants, all disputed facts are construed in the light most favorable to the plaintiff. *Davenport v. Causey*, 521 F.3d 544, 546 (6th Cir. 2008).

As relevant here, on January 7, 2019, Plaintiff Toni Gallow filed her Second Amended Complaint (ECF No. 26) in which she alleges one federal cause of action and seven state causes of action against Defendants East Guernsey Local School District Board of Education ("East Guernsey") and Adam Pittis. The sole federal cause of action that Ms. Gallow alleges (Count One) is a violation of her Fourteen Amendment due process rights by Adam Pittis, in both his individual and official capacities.[1] The relevant allegations from Ms. Gallow's complaint are as follows.

---

[1] East Guernsey is not a defendant in Count One.

1

Ms. Gallow is a teacher who has been employed by East Guernsey since 2003. (ECF No. 26 ¶¶ 15, 17, 72.) In addition to her teaching responsibilities, Ms. Gallow has held more than a dozen supplemental positions, including as a Home Tutor, Yearbook Advisor, Resident Educator Mentor, and Head Boys & Girls Track Coach (the "supplemental positions"). (*Id.* ¶¶ 17, 20.) With respect to her teaching position, Ms. Gallow has the job security that tenure provides; however, with respect to the supplemental positions, she has been required to reapply annually for any positions that she sought. (*Id.* ¶ 20; ECF Nos. 26-3 – 26-6.) Each year, Ms. Gallow reapplied for various supplemental positions, and each year she signed a one-year contract for each position she was granted. (ECF No. 26 ¶ 20; ECF Nos. 26-3 – 26-6.) The contracts for her supplemental positions all expressly provide that they expire at the end of the applicable school year and that the supplemental positions do not carry with them any right to a continuing contract or a notice of nonrenewal. (ECF Nos. 26-3 – 26-6.)

East Guernsey procedure requires each interested teacher applying for a supplemental position to submit a letter of interest to the office of the superintendent. (ECF No. 26 ¶ 32.) It is then the superintendent's prerogative whether to recommend to East Guernsey to grant the contract. (*Id.*) East Guernsey has the ultimate say in whether to grant or deny each request for a contract for a supplemental position. (*Id.*)

In summer 2015, East Guernsey hired Mr. Pittis to be the new superintendent for the school district. (*Id.* ¶ 26.) In June 2016, Ms. Gallow submitted letters of interest to Mr. Pittis's office for seven supplemental positions for the 2016–17 school year. (*Id.* ¶¶ 31–32, 52.) Ms. Gallow had previously been appointed to these seven positions, often many times before. (*Id.* ¶¶ 20, 25, 31.)

On September 9, 2016, Ms. Gallow and Mr. Pittis attended a meeting during which Mr. Pittis accused Ms. Gallow of a crime. (*Id.* ¶¶ 37–38.) Specifically, Mr. Pittis accused Ms. Gallow of falsifying her time sheets and "double billing." (*Id.* ¶¶ 38–39.) At two subsequent meetings, Ms. Gallow provided evidence to Mr. Pittis to refute his allegations. (*Id.* ¶¶ 43–44, 48.) However, Mr. Pittis told Ms. Gallow that he would not be recommending renewal of most of her supplemental contracts for the 2016–17 school year, seemingly based on his suspicions of wrongdoing by Ms. Gallow. (*Id.* ¶¶ 45, 49.) As a result, Ms. Gallow received contracts for only three of the seven supplemental positions for which she applied. (ECF Nos. 26-4 – 26-6.)

Subsequent to these meetings, Mr. Pittis told other East Guernsey employees about his suspicions that Ms. Gallow had been double billing. (ECF No. 26 ¶ 56.) Rumors began to spread, and Ms. Gallow became the subject of significant gossip in the community. (ECF No. 26 ¶¶ 60–62.) Based on all of this, on October 24, 2017, and again on November 6, 2017, Ms. Gallow requested that she be granted a name-clearing hearing in order to prove that the allegations were false. (*Id.* ¶¶ 66–67.) Mr. Pittis denied both requests. (*Id.* ¶ 67.)

Ms. Gallow alleges that Mr. Pittis's refusal to allow her a name-clearing hearing has deprived her of her liberty interest in her reputation, good name, honor, and integrity, in violation of the Due Process Clause of the Fourteenth Amendment. (*Id.* ¶¶ 78, 80.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling*

*Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to " 'set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III. ANALYSIS

Defendants have filed a Motion for Partial Summary Judgment on the grounds that qualified immunity is a bar to liability on Count One, the only federal claim. (ECF No. 33, at 1.) Defendants then argue that the Court should decline to exercise supplemental jurisdiction over the remaining claims, all of which arise under state law. (*Id.* at 12.)

### A. Official Capacity Claim

Although Mr. Pittis has raised a qualified immunity defense as to the Fourteenth Amendment claim brought against him in both his personal and official capacities, this is not a valid defense to the claim brought against him in his official capacity. *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985). Rather, "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess . . . ." *Id.* at 167.

A lawsuit brought against a public official in his official capacity is treated as a suit against the government entity rather than the official personally, since the entity is the real party in interest. *Id.* at 166. As a result, in order to prove liability, a plaintiff must prove that it was the entity's policy or custom that caused the constitutional injury. *Id.*; *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

Ms. Gallow does not offer any evidence to prove that Mr. Pittis's actions were the result of an East Guernsey policy or custom. Ms. Gallow alleges in her Complaint that there was a "pattern of a hostile environment toward women and older employees." (ECF No. 26 ¶ 46.) But "specific facts" are required to defeat summary judgment, rather than "mere allegations." *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). In addition, these vague and conclusory allegations are all made in a context entirely divorced from the denial of the name-clearing hearing, which is the basis for the Due Process claim. (ECF No. 26 ¶¶ 46, 70, 74–76.) As a result, there is no evidence or even an allegation to establish that East Guernsey had a policy or custom that caused the alleged constitutional injury, and Mr. Pittis is awarded summary judgment as to the Due Process claim brought against him in his official capacity.

### B. Individual Capacity Claim

Because Mr. Pittis has raised the defense of qualified immunity as a bar to the due process claim brought against him in his personal capacity, Ms. Gallow bears the burden of proving that he is not entitled to summary judgment. *Davenport*, 521 F.3d at 550. An official is entitled to the defense of qualified immunity so long as he has not violated a " 'clearly established statutory or constitutional right[] of which a reasonable person would have known.' " *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). This is a purposefully

high bar for a plaintiff. Qualified immunity is intended to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Accordingly, "it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 340 (1986)).

In order for a right to be "clearly established," while there need not be "a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 741. The right must be dictated by "'controlling authority in the[] jurisdiction at the time of the incident' or [by] 'a consensus of cases of persuasive authority such that a reasonable [official] could not have believed that his actions were lawful.'" *Id.* at 746 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

Moreover, the "right" at issue must be "so well defined that it is 'clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Id.* at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "This requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 309). That is, there must exist a precedent where "an offic[ial] acting under similar circumstances . . . was held to have violated" the constitutional provision at issue. *White*, 137 S. Ct. at 552.

The qualified immunity analysis involves a two-step analysis involving a determination whether the facts that the plaintiff has pleaded constitute the violation of a constitutional right and whether said right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). It is in the discretion of the Court to decide the order of these two steps, based on the particular circumstances of the case. *Id.* at 236.

Here, Ms. Gallow alleges that there exists a constitutional right under the Due Process Clause to a name-clearing hearing after a government employer refuses to rehire or to renew an employment contract while, in the process, damaging an individual's reputation. (ECF No. 38, at 14–15.) Accordingly, Ms. Gallow claims that she was deprived of—and is entitled to—such a name-clearing hearing. Sixth Circuit precedent establishes that no such constitutional right exists.

At the outset, for Ms. Gallow's procedural due process claim to succeed, she must establish a deprivation under the Fourteenth Amendment. A procedural due process violation requires that there be a protected property or liberty interest of which the plaintiff was deprived without sufficient procedures. *Crosby v. Univ. of Ky.*, 863 F.3d 545, 552 (6th Cir. 2017), *cert. denied sub nom. Crosby v. Capilouto*, 138 S. Ct. 741 (2018). Ms. Gallow does not allege that she was deprived of any property interest, nor could she.[2] Rather she alleges that she was deprived of her liberty interest in her reputation, good name, honor, and integrity. (ECF No. 26 ¶ 80.)

It is well-settled that " 'a person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment.' " *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (quoting *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)). "But defamation alone is not enough to trigger this constitutional protection; rather, the alleged damage must be tied to '[s]ome alteration of a right or status previously recognized by state law.' " *Crosby*, 863 F.3d at 555 (alteration in original) (quoting *Quinn*, 293 F.3d at 319). Thus, only where the plaintiff's reputation is damaged in conjunction with such an alteration of a right or status is the plaintiff entitled to a name-clearing hearing. *Id.* at 556. In order to be entitled

---

[2] To prove that she was deprived of any property interest, Ms. Gallow would have had to demonstrate a "legitimate claim of entitlement" to the supplemental positions, based on "existing rules or understandings that stem from an independent source such as state law . . . ." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). She cannot legitimately claim such an entitlement, for, consistent with state law, Ms. Gallow's contracts for her supplemental positions each say they are to last only one year and that they carry no right of renewal. (ECF Nos. 26-4 – 26-6.) Moreover, contracts for supplemental positions are specifically excluded from the automatic renewal provisions established by Ohio law. *See* Ohio Rev. Code Ann. § 3319.11(I) (West 2019).

7

to a hearing the plaintiff must prove that the damaging statements 1) were "made in conjunction with the plaintiff's termination from employment" 2) were " 'seriously damag[ing]' " in character (i.e., more than an allegation of "improper or inadequate performance, incompetence, neglect of duty or malfeasance"), 3) were publicized, 4) were false, and 5) were publicized voluntarily. *Ludwig v. Bd. of Trs. of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997) (quoting *Roth*, 408 U.S. at 573); *accord Crosby*, 863 F.3d at 555.

Here, the Court focuses only on the first element (the "termination element") —whether the statements "were made in conjunction with [Ms. Gallow's] termination from employment." That element lies at the heart of the parties' dispute, and the Court's construction of that element, as a matter of law, is dispositive. As a result, it is unnecessary to address the other elements.

Mr. Pittis argues that the termination element means what it says, and that Ms. Gallow's claim fails given that the statements at issue were not "made in conjunction with [her] termination," since she was never "terminat[ed]." Ms. Gallow, however, argues that precedent compels a less literal reading of this phrasing and that a failure to rehire or renew a contract satisfactorily checks this box. In support of her argument Ms. Gallow relies principally on *Roth*, *Paul v. Davis*, and *Siegert v. Gilley* as the basis for her asserted constitutional right, so that is where the Court begins.

First, *Roth* involved a non-tenured college professor who was not rehired after his initial contract was completed. 408 U.S. at 566. Mr. Roth sued, alleging that he was deprived of a property interest when his contract was not renewed. *Id.* at 568. The *Roth* court's analysis focused on whether Mr. Roth had a property interest in his teaching contract (and thus a right to due process); ultimately the Court determined that under state law, he did not. *Id.* at 566–67, 577–78.

Ms. Gallow relies on *Roth* to bolster her claim to a liberty interest, but the case does not support her argument. While the Court opined, in dicta, that "[t]here might be cases in which a

8

State refused to re-employ a person under such circumstances that interests in liberty would be implicated" such as when failing to renew a contract on account of allegations of dishonesty or immorality, *id.* at 573, the Court's reasoning cannot fairly be read to encompass a situation like Ms. Gallow's. Most importantly, the Court's plain language encompasses only "re-employment," *see id.*, which necessarily implies unemployment. This is the genesis of the termination element requirement for Ms. Gallow's claim, but *Roth* does not make the element as broad as she would like.

Second, *Paul v. Davis* stemmed from a police force's creation of flyers of "known shoplifters" that the police disseminated to local shops. 424 U.S. 693, 694–95 (1976). Mr. Davis, one of the "known shoplifters," sued on the grounds that he had suffered reputational harm and was thereby deprived of a liberty interest in his reputation without due process of law. *Id.* at 697. However, the Court specifically declined Mr. Davis's invitation to constitutionalize defamation. *Id.* at 709. *Paul* is not an employment case, so its application to these facts is limited. However, it is apparent that *Paul* built on the framework that *Roth* had created. *Paul* articulates that there is no constitutional protection against a public employee's defamation by his or her public employer, unless, as *Roth* established, that defamation is made in connection with a termination from employment. *See id.* at 710.

Nevertheless, Ms. Gallow argues that *Paul*'s characterization of *Roth* supports her claim: "*Roth* recognized that governmental action defaming an individual in the course of declining to rehire him *could* entitle the person to notice and an opportunity to be heard as to the defamation . . . ." *Id.* at 709 (emphasis added). But *Paul* also makes clear two other things—1) that to establish a claim under Section 1983 based on defamation, that "the defamation had to occur in the course of the termination of employment" and 2) that "there is no suggestion in *Roth* to indicate that a

9

hearing would be required each time the State in its capacity as employer might be considered responsible for a statement defaming an employee *who continues to be an employee.*" *Id.* at 710 (emphasis added). Thus, *Paul* does not support Ms. Gallow's position.

Third, *Siegert v. Gilley* involved a psychologist who had resigned from his position to avoid being fired and was subsequently given a poor recommendation. 500 U.S. 226, 227–29 (1991). The poor recommendation impeded his ability to find new employment. *Id.* at 228–29. The Court found it determinative that the poor recommendation was not "incident to the termination of Siegert's employment" but rather was written weeks after Dr. Siegert voluntarily resigned. *Id.* at 233–34. *Siegert* takes the two pieces of the framework created by *Roth* and *Paul* and ties them together. It established that in the employment context, defamation does not constitute an intrusion of the liberty interest established by the Fourteenth Amendment if it is not made in connection with a termination of employment. *Id.* Because *Siegert* involved a termination and because the result turned on the fact that the statements were not made in conjunction with that termination, this case is not helpful to Ms. Gallow either.

There are, however, two cases from this circuit that are determinative here. The first is *Lisle v. Metropolitan Government of Nashville and Davidson County*. In *Lisle*, three patrol officers were the subject of an internal affairs investigation that they had been harassing Hispanic motorists at road blocks. 73 F. App'x 782, 784 (6th Cir. 2003) (per curiam). During the investigation, the officers were assigned to desk duty, and they were not returned to patrol duty after the investigation concluded. *Id.* The allegations against the officers had been publicized by a local newspaper, and they were not able to find any comparable jobs. *Id.* In reviewing relevant Supreme Court and Sixth Circuit precedent, the court found that "[i]n every case upholding a liberty claim, termination was a necessary pre-condition." *Id.* at 788 (citing cases). Like Ms. Gallow, the court found that the

*Lisle* plaintiffs attempted to rely on "scattered dicta in opinions not binding on this court."[3] *Id.* at 789. The *Lisle* court then reasoned as follows:

> We today decline the opportunity to follow the Seventh Circuit and extend our precedents to constitutionalize the job assignment policies of public employers throughout this jurisdiction. Not only are our precedents in this matter unambiguously clear, to hold otherwise would involve the courts in an [sic] nearly standardless review of state and municipal reassignments, whenever word of them escapes to the public. Any such reassignment would be held to require constitutional process if the new job was more "menial" than the one previous [sic] held, was regarded as having "a lower status" by some unspecified observer, was degrading the previous holder of a more lofty position (though presumably not to those who always toiled in it), or was sufficiently "far beneath" the earlier position. To recite these guideposts is to demonstrate their subjective nature and dependence on the idiosyncratic temperament of the affected employee.

*Id.* Accordingly, the court specifically concluded as follows: "We therefore hold that where a state employee was not terminated incident to the unfavorable statement, there was no violation of the liberty interest protected by the Due Process Clauses." *Id.*

The second Sixth Circuit case, decided just two years ago, is *Crosby*. Dr. Crosby was removed as the Chair of the Department of Health Behavior at the University of Kentucky after an investigation into reports of inappropriate behavior. 863 F.3d at 549–50. Dr. Crosby remained employed as a tenured professor, but in addition to losing his position as Chair, his office and administrative support were moved to another department, and he lost his $5,000 stipend. *Id.* Dr. Crosby then sued the University of Kentucky based on an alleged denial of his liberty interest in his reputation after the school denied him a name-clearing hearing. *Id.* at 551, 555.

As in Ms. Gallow's case, the primary dispute in *Crosby* was over the fact that his employment was not terminated. *See id.* at 555–56. The Sixth Circuit emphasized that the termination element of a due process claim is "derived from the proposition that the damage to

---

[3] Ms. Gallow relies on the same, highlighting three out-of-circuit cases, all of which are older than *Lisle*. (ECF No. 38, at 13.)

11

plaintiff's reputation must be accompanied by 'some alteration of a right or status previously recognized by state law' in order to implicate a liberty interest." *Id.* at 556 (quoting *Quinn*, 293 F.3d at 319). Dr. Crosby argued that his position as Chair constituted a distinct employment arrangement such that his termination from that position was sufficient to meet the termination element. *Id.* However, the Sixth Circuit could find no cases holding that removal from a nontenured administrative position (even one that came with additional compensation) constituted a "termination from employment." *Id.* Thus, the *Crosby* court found it significant that Dr. Crosby remained a fully tenured professor and that the existence of unsavory allegations that might make him less attractive to other employers did not constitute a deprivation of a liberty interest. *Id.* at 556–57.

Ms. Gallow attempts to distinguish *Crosby* from her case because whereas she was not rehired to several supplemental contracts, Dr. Crosby was removed from his position. But her distinction entirely misses the point on which *Crosby* could not be clearer—defamation in the context of any change in employment besides complete termination (i.e., including the failure to rehire or to renew a contract) does not constitutionally entitle the defamed individual to a name-clearing hearing.

*Crosby*'s analysis demonstrates that, rather than providing support for Ms. Gallow's argument, *Roth* and *Paul* actually originated the requirement of the termination element that she now disputes. *See id.* at 556. *Roth* and *Paul* both analyzed their respective facts in the context of property rights as determined by state law. 408 U.S. at 566–67, 577–78; 424 U.S. at 710–11. In *Roth*, state law made clear that Mr. Roth had no property right in the continuation of his employment. 408 U.S. at 566–67. Likewise, in the case of Ms. Gallow she had no right under state law to any of the supplemental positions to which she applied. *See supra* note 3. Ms. Gallow

12

remains employed by East Guernsey, which further underscores why Ms. Gallow has no right to a name-clearing hearing.

Sixth Circuit precedent is clear that, as Mr. Pittis argues, "termination" means termination. It follows that Ms. Gallow does not have a constitutional right to a name-clearing hearing under these circumstances. As a result, because Ms. Gallow has not pleaded the violation of a constitutional right, Mr. Pittis is entitled to summary judgment on Count One.

### C. State Law Claims

Summary judgment in favor of Defendants on Count 1, the only federal claim, leaves seven causes of action arising under state law. Although the Court has discretion to retain supplemental jurisdiction over these claims, doing so here would not be a prudent exercise of this discretion.

"A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). "[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . if (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367.

There are, of course, circumstances in which supplemental jurisdiction may be appropriate even where the sole federal claim has been resolved, such as when the district judge is already intimately familiar with a complicated case. In such a case, in the interest of judicial economy and convenience, supplemental jurisdiction may be appropriate. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[A] federal court should consider and weigh in each case, and at every

13

stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims.").

In this case, from the outset the state claims substantially predominated, given that there were seven as compared to one federal claim, and the state claims are much more robust than the federal claim. This case is in its early stages, and summary judgment has been awarded as to the sole federal claim upon initial judicial presentation. The state courts are well-suited to decide the remainder of Ms. Gallow's claims, should she choose to pursue them.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment as to Count One is **GRANTED**, and the remaining state law claims are **DISMISSED** without prejudice for lack of jurisdiction**.**

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**